## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| LANEE J. THORNSLEY, | CASE NO. 5:24-CV-01145 |
| Plaintiff, | |
| | DISTRICT JUDGE CHRISTOPHER A. BOYKO |
| vs. | |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Lanee J. Thornsley ("Plaintiff" or "Ms. Thornsley") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.      Procedural History

Ms. Thornsley filed applications for DIB and SSI benefits on October 19, 2021, and February 1, 2022, respectively, alleging disability beginning on January 1, 2019.  (Tr. 81-82.) She alleged disability due to mental impairments, including generalized anxiety disorder, major depressive disorder ("MDD"), borderline personality disorder, panic disorder, agoraphobia, and obsessive-compulsive disorder ("OCD").  (Tr. 72, 83.)  Ms. Thornsley's applications were denied at the initial level (Tr. 81-82) and upon reconsideration (Tr. 92-93).  She requested a

1

hearing before an Administrative Law Judge ("ALJ"). (Tr. 146-47.) The hearing was held on June 27, 2023. (Tr. 35-65.) On August 15, 2023, the ALJ issued a decision finding Ms. Thornsley had not been under a disability within the meaning of the Social Security Act from January 1, 2019, through the date of the decision. (Tr. 9-29.) On May 7, 2024, the Appeals Council affirmed the decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 66-68.) Ms. Thornsley then filed the pending appeal. (ECF Doc. 1.) The matter is fully briefed by the parties. (ECF Docs. 7, 9, 10.)

## II.     Evidence

Although the ALJ identified several severe physical and mental impairments (Tr. 14-15), Ms. Thornsley bases her appeal solely on a medical opinion regarding her mental impairments (ECF Doc. 7). The evidence summarized herein is accordingly limited to that which relates to Ms. Thornsley's mental health symptoms and treatment.

### A.     Personal, Educational, and Vocational Evidence

Ms. Thornsley was born in 1995 and was 23 years old on the alleged disability onset date, making her a younger individual under Social Security regulations on the alleged onset date. (Tr. 72, 83.) She has at least a high school education. (Tr. 246.) Ms. Thornsley has not worked since January 1, 2019, the alleged onset date. (Tr. 72, 83.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

On April 10, 2017, Ms. Thornsley started treatment for depression with Denise K. Miller, DO, at Union Physician Services in Newcomerstown, Ohio. (Tr. 1114.) She sought treatment following admission to a psychiatric hospital for suicidal thoughts and requested referral to a counselor. (*Id.*) Dr. Miller diagnosed Ms. Thornsley with suicidal ideation, anxiety and

2

depression, and insomnia and started her on buspirone, trazodone, and escitalopram oxalate.  (Tr. 1116.)  Ms. Thornsley followed up with Dr. Miller in May 2017, then returned in August 2017 after an emergency room visit for suicidal thoughts.  (Tr. 1117, 1121.)  Ms. Thornsley had not been admitted to the hospital but was given a shot and sent home with Xanax.  (Tr. 1121.)  She had plans to see a psychiatrist.  (*Id.*)  Dr. Miller diagnosed Ms. Thornsley with suicidal ideation and severe episode of recurrent MDD with psychotic features.  (Tr. 1123.)  She discontinued buspirone and added ziprasidone, clomipramine, and Xanax.  (*Id.*)

Ms. Thornsley continued to see Dr. Miller every one to three months throughout 2017 and 2018 with few changes in her mental health.  (*See* Tr. 786-87, 1124-164.)[1]  In October 2018, Ms. Thornsley told Dr. Miller she had cancelled one appointment with a psychiatrist and had not gone to a second appointment.  (Tr. 786.)  She said she continued to see her counselor.  (*Id.*)

The counseling records start in October 2018, though Ms. Thornsley reported seeing a counselor as early as March 2018.  (*See* Tr. 788, 1149.)  During 2018, Ms. Thornsley regularly saw Teri L. Carpenter, LISW-S at Cleveland Clinic Union Hospital.  (*See* Tr.  775-84, 788.)  She reported ongoing anxiety, depression, and panic attacks (*see, e.g.*, Tr. 775, 777, 782, 784, 788) but acknowledged that she obtained a dog for emotional support, and it was helping (Tr. 788).  She discussed pursuing volunteer work (Tr. 784) and indicated that she spent time with friends and family, walked her dog, and cleaned the house (Tr. 779, 781).

After the alleged onset date, Ms. Thornsley continued to regularly see Dr. Miller for both her mental and physical health (Tr. 993-1106) and continued counseling with LISW-S Carpenter (Tr. 749-88).  On January 7, 2019, Ms. Thornsley saw Dr. Miller for menstrual issues.  (Tr. 1104-06.)  They discussed that Ms. Thornsley had started seeing a psychiatrist who would begin

---

[1] Ms. Thornsley's treatment prior to the alleged onset date of January 1, 2019 is discussed more summarily herein.

overseeing her mental health medication; however, Dr. Miller noted she would continue to prescribe Xanax as needed because the psychiatrist "prefer[red] not to give."  (Tr. 1106.) Throughout 2019, Ms. Thornsley usually saw Dr. Miller for physical rather than mental health issues.  Dr. Miller's review of systems typically indicated that Ms. Thornsley was negative for dysphoric mood and was not nervous or anxious.  (Tr. 1065, 1070, 1084, 1093, 1105.)

At an appointment with LISW-S Carpenter on March 26, 2019, Ms. Thornsley reported feeling "down in the dumps" after learning her grandfather was diagnosed with prostate cancer. (Tr. 766.)  She stated she "very rarely" struggled with anxiety but still had concerns about depression.  (*Id.*)  LISW-S Carpenter noted that she described her depression in less-severe terms than previously.  (*Id.*)  Ms. Thornsley acknowledged using alcohol to avoid feelings of grief and loss, and LISW-S Carpenter educated her on coping skills.  (*Id.*)

On July 1, 2019, Ms. Thornsley returned to counseling with LISW-S Carpenter after a nearly four-month absence.  (Tr. 764.)  She reported increased symptoms of depression and continued daytime sleeping.  (*Id.*)  She also reported feeling like a failure because she could not maintain employment at a new job.  (*Id.*)  Ms. Thornsley's father had helped her obtain work at a company that helped developmentally disabled individuals.  (*Id.*)  Ms. Thornsley loved the job, but she had an anxiety attack and quit after being mandated to work a 16-hour shift.  (*Id.*)  She acknowledged that her depression could be due to not sleeping and admitted that she had not been taking the melatonin prescribed by Dr. Miller.  (*Id.*)  She and LISW-S Carpenter discussed her plans to start taking melatonin again and to begin a job search once her sleep improved.  (*Id.*)

At a July 15, 2019 visit with LISW-S Carpenter, Ms. Thornsley reported she had begun job searching and continued to struggle with depression and anxiety.  (Tr. 762.)  She was considering applying to a Verizon wireless store but had never done well working full time.  (*Id.*)

4

On August 12, 2019, Ms. Thornsley presented to LISW-S Carpenter as "tearful and anxious" and reported increased symptoms of anxiety and depression.  (Tr. 755.)  She was being discharged from personal and family counseling services because of missed appointments and felt anxious and emotional because she learned from a friend that LISW-S Carpenter would be leaving the organization.  (*Id.*)  She also felt anxious about starting a new job at Wendy's soon and said it was important to keep her hours and workdays to "a manageable range."  (*Id.*)  Ms. Thornsley and LISW-S Carpenter discussed the transition to a new therapist as well as coping skills for managing anxiety in a new job.  (*Id.*)

On August 26, 2019, Ms. Thornsley told LISW-S Carpenter she did not start her job at Wendy's because the day she was supposed to start, "she experienced a peak in anxiety and was unable to go to work."  (Tr. 749.)  She said she was considering applying for disability.  (*Id.*)  LISW-S Carpenter referred Ms. Thornsley to a new counselor, scheduling an appointment for September 10, 2019.  (*Id.*)  It does not appear that Ms. Thornsley kept this appointment.

Ms. Thornsley underwent a psychiatric diagnostic evaluation with Christi Gallagher, LPCC-S, at Allwell Behavioral Health Services ("Allwell") on October 30, 2019.  (Tr. 791-801.) She reported taking Vistaril, clomipramine, ziprasidone, bupropion, melatonin, and Xanax.  (Tr. 794.)  Her appearance, speech, affect, mood, and intellectual functioning were "not remarkable." (Tr. 797.)  She was oriented to person, place, and time and acknowledged her behavioral health issues.  (*Id.*)  Her judgment and memory were not impaired, and she did not report suicidal ideations or other thoughts of harm.  (Tr. 798.)  She reported disordered eating, a depressed mood, anxiety, anger/aggression issues, and mood swings.  (Tr. 798-90.)  She denied anti-social, high risk, or oppositional behaviors, ADHD symptoms, disturbed reality, and cognitive difficulties.  (*Id.*)  She said she could not get on a healthy sleep schedule.  (Tr. 790.)

On February 5, 2020, Ms. Thornsley attended a therapeutic behavioral services and case management appointment at Allwell with Rachelle Dobbins, QMHS.  (Tr. 892-97.)  She expressed anxiety about the process of starting regular appointments at Allwell (Tr. 893) but said she would be fine once she started (Tr. 896).  Ms. Thornsley met with different case managers throughout her time at Allwell.  (Tr. 892-947.)

Ms. Thornsley saw Dr. Miller again on February 17, 2020, and they discussed Ms. Thornsley's mental health.  (Tr. 1054-56.)  Ms. Thornsley admitted to taking extra Xanax "due to recent circumstances" and said she had run out, which led to her being unable to sleep.  (Tr. 1054.)  She said she "gets in a full panic mode" at night and "eats a lot."  (*Id.*)  She also said her medication was working well, and she did not want to make changes.  (*Id.*)  Dr. Miller diagnosed Ms. Thornsley with severe episode of recurrent MDD without psychotic features.  (Tr. 1056.)  Upon examination, Ms. Thornsley had a tearful affect and normal behavior, thought content, and judgment.  (*Id.*)  Dr. Miller noted Ms. Thornsley's upcoming psychiatric appointment and recommended counseling.  (*Id.*)

On February 26, 2020, Ms. Thornsley had an initial pharmacological management session at Allwell with George Moses, DO.  (Tr. 803-12.)  Ms. Thornsley told Dr. Moses that her "depression was overwhelming" but she thought her current medication was helping.  (Tr. 803-04.)  She said her OCD was under control.  (Tr. 804.)  She reported that she often overate, she took Xanax at night because she was anxious, and she could not work due to anxiety.  (*Id.*)  She said her energy was limited and sometimes she did not want to get out of bed; at other times she had "manic periods" during which she felt "on top of the world."  (*Id.*)  Dr. Moses cautioned Ms. Thornsley against taking Xanax at night due to her sleep apnea and discussed the dangers of that class of drug.  (*Id.*)  He made the following clinical findings: normal appearance, regular speech,

6

clear and linear thought processes, no overt delusions, intact judgment and insight, oriented to person place and time, and appropriate mood and affect.  (Tr. 808-09.)  He diagnosed Ms. Thornsley with MDD recurrent episode severe, panic disorder, and OCD.  (Tr. 811.)  He instructed her to see him monthly and discontinued Geodon (ziprasidone) as not appropriate for her diagnosis; he continued bupropion and clomipramine.  (Tr. 810.)

On March 11, 2020, Ms. Thornsley attended a pharmacological management appointment with Dr. Moses.  (Tr. 813-22.)  She reported doing well on decreased medication. (Tr. 814.)  Her mental status findings were normal except that Dr. Moses noted her recent and remote memory and attention span/concentration were "limited."  (Tr. 818-19.)  He continued her medications and instructed her to return in four to six weeks.  (Tr. 820.)

Ms. Thornsley attended a telehealth appointment with Dr. Moses on April 15, 2020.  (Tr. 823-32.)  He noted that her problems were stable but did not include any notes on her reported symptoms or mental status findings.  (Tr. 824-29.)  He continued her medications and instructed her to follow-up in four to six weeks.  (Tr. 830.)

On April 21, 2020, Ms. Thornsley told Dr. Miller's nurse practitioner that she was taking her medications, she had not had any anxiety attacks for a "quite a while," and she was sleeping well.  (Tr. 741.)  Throughout the rest of 2020, Ms. Thornsley saw Dr. Miller a few more times for physical health issues.  (Tr. 1042-63.)  Dr. Miller always noted that Ms. Thornsley's psychiatric systems were unremarkable.  (Tr. 1043, 1052.)  In June, Ms. Thornsley reported that she was not taking all of her medications.  (Tr. 1052.)

At an April 29, 2020 telehealth visit with Dr. Moses, Ms. Thornsley reported being less tired during the day and having improved energy.  (Tr. 834.)  She noted that she was eating more due to COVID-19 stay at home orders.  (*Id.*)  Her mental status findings were normal.  (Tr. 838-

89.)  Dr. Moses increased Ms. Thornsley's clomipramine for OCD and sleep, continued her Wellbutrin, and cautioned her against taking Xanax at night.  (Tr. 840.)  He also referred her for individual psychotherapy.  (*Id.*)  At a June 2020 telehealth appointment, Ms. Thornsley reported that she had stopped taking clomipramine and was taking Xanax at night again.  (Tr. 844, 850.)  Dr. Moses noted no remarkable mental status findings and continued Wellbutrin, instructing her to follow up in three months.  (Tr. 848-49, 851.)

Ms. Thornsley began individual psychotherapy at Allwell with LPCC-S Gallagher on August 10, 2020.  (Tr. 886-88.)  She complained of anxiety, trouble falling and staying asleep, and depression.  (Tr. 886.)  She reported she was taking less clomipramine than prescribed because she felt the need to keep taking Xanax.  (*Id.*)

Ms. Thornsley had her next medication management appointment with Dr. Moses on September 2, 2020, via telehealth.  (Tr. 853-63.)  She reported that her sleep was "ok," and she was planning to talk to her primary care physician about a sleep study.  (Tr. 854.)  She also stated that her mood was "ok" and changed with her menstrual cycle, her energy was good, and she was getting more physical activity.  (*Id.*)  She informed Dr. Moses that she was taking a lesser dose of clomipramine than prescribed.  (*Id.*)  Dr. Moses found that Ms. Thornsley had regular speech, clear and linear thought processes, intact judgment and insight, no impairment in memory, and appropriate mood and affect.  (Tr. 858-59.)  She was oriented to place and time and her attention span and concentration were within normal limits.  (Tr. 859.)  Dr. Moses continued her on Wellbutrin and clomipramine.  (Tr. 860.)  He advised a three-month follow up.  (Tr. 861.)  A November 2020 appointment contains similar reports from Ms. Thornsley and identical examination findings.  (Tr. 862-74.)

On November 12, 2020, Ms. Thornsley saw LPCC-S Gallagher for therapy via telehealth. (Tr. 889-91.)  She admitted that she had not made the appointment, but her father had called and scheduled it during one of her depressive episodes.  (Tr. 890.)  She attributed the episode to her menstrual cycle and premenstrual dysphoric disorder and said she was doing better.  (*Id.*)  LPCC-S Gallagher encouraged her "to take more action when feeling down" like spending time with friends or walking the dog.  (*Id.*)  Ms. Thornsley agreed to try.  (*Id.*)  LPCC-S Gallagher noted that Ms. Thornsley was making progress.  (*Id.*)

On February 8, 2021, Ms. Thornsley saw Dr. Miller to discuss her mental health and back pain.  (Tr. 1038-40.)  She reported that her mood "was a little better," and she was in between counselors.  (Tr. 1038.)  She was negative for dysphoric mood and was not found to be nervous or anxious.  (Tr. 1039.)  Her behavior, thought processes, and judgment were normal.  (Tr. 1040.)  Dr. Miller noted that Ms. Thornsley's anxiety was "controlled currently," but she was "scared to get a job and wanting to seek disability for such."  (*Id.*)  She told Ms. Thornsley to speak with her psychiatrist Dr. Moses if she was struggling with anxiety to have him complete paperwork for disability, as Dr. Miller did not think she was disabled.  (*Id.*)

On February 10, 2021, Ms. Thornsley saw Dr. Moses for a telehealth medication management appointment.  (Tr. 875-85.)  She reported that her mood had been "fairly good" but leaving the house was hard, and she had insomnia the night before an appointment, so she often cancelled.  (Tr. 876.)  Her sleep was better, and her energy was limited by back pain.  (*Id.*)  Upon examination, Dr. Moses found Ms. Thornsley's speech, thought processes, associations, judgment, insight, and orientation were normal, but he noted that she considered her short-term memory poor, and her mood and affect were impacted by night anxiety and leaving home.  (Tr. 880-81.)  He offered to increase Ms. Thornsley's clomipramine dosage, but she was too anxious

to make any changes, so her medications remained the same.  (Tr. 882.)  He advised her to start counseling again "ASAP" and recommended returning in two months.  (Tr. 822-83.)

A February 24, 2021 case management note from Allwell indicates that Ms. Thornsley did ask Dr. Moses for a disability letter at some point.  (Tr. 938.)  The case manager informed Ms. Thornsley that Dr. Moses would not write a letter as she had not been compliant in keeping appointments regularly.  (*Id.*)  The case manager reminded Ms. Thornsley that she could work part time, and this would be good for her.  (*Id.*)  The notes states that Ms. Thornsley became upset and stated she needed the letter, she was unable to work, and she did not know what to do. (*Id.*)  This appears to be the last recorded appointment at Allwell.

Ms. Thornsley saw Dr. Miller during 2021 for physical issues.  (Tr. 1026-36.)  Dr. Miller always noted that she displayed normal thought content, and judgment, was negative for dysphoric mood, and was not nervous or anxious.  (Tr. 1026, 1029, 1033-34, 1035-36.)

On August 18, 2021, Ms. Thornsley presented to Megan Blake, LSW, at Cedar Ridge Behavioral Health Solutions ("Cedar Ridge") for an initial assessment.  (Tr. 959-67.)  She reported that she had not attended counseling "for a few years," and she was struggling with her anxiety.  (Tr. 959.)  She expressed that some days she felt like she could "rule the world," but on others she lost interest in things, stayed in bed, and only wanted to sleep.  (*Id.*)  When depressed, she said she had little energy, moved slowly, had difficulty concentrating, and felt hopeless.  (*Id.*) She said her anxiety worsened around her menstrual cycle or when going in public and meeting new people.  (*Id.*)  She endorsed bad anxiety at night, saying her brain would not shut off, imagining worst case scenarios.  (*Id.*)  She also reported restlessness, irritability, panic attacks, and mania symptoms.  (*Id.*)  She stated that she used to struggle with OCD, but symptoms of intrusive thoughts, checking, and repetition had become infrequent.  (*Id.*)  She reported no

suicidal thoughts.  (Tr. 965.)  LSW Blake observed that Ms. Thornsley had a neat and well-groomed appearance, normal affect, a calm, euthymic, and relaxed mood, clear thought processes, intact memory, normal judgment, and good insight and concentration.  (Tr. 964.)

On September 21, 2021, Ms. Thornsley met with Misty Hunt, a case manager at Cedar Ridge.  (Tr. 1310.)  She felt incapable of working full time due to struggles with mental health.  (*Id.*)  Ms. Hunt and Ms. Thornsley discussed options such as applying for social security and an employment services referral.  (*Id.*)  On October 5, 2021, Ms. Thornsley told Ms. Hunt she had moved from her father's home to her brother's and felt happy with the change.  (Tr. 1311.)

On September 27, 2021, Ms. Thornsley underwent a psychiatric evaluation with Katlyn Dailey, APRN at Cedar Ridge.  (Tr. 969-74.)  APRN Dailey's evaluation reflects that she reviewed LSW Blake's notes regarding Ms. Thornsley's self-reported symptoms.  (Compare Tr. 959 with Tr. 969.)  APRN Dailey did not record clinical mental status findings in her evaluation.  (Tr. 969-74.)  She diagnosed Ms. Thornsley with borderline personality disorder and noted an ongoing MDD diagnosis.  (Tr. 973.)  She prescribed 20mg propranolol and continued 50mg clomipramine and 150mg bupropion daily.  (*Id.*)

On October 19, 2021, Ms. Thornsley attended a case management appointment at Cedar Ridge.  (Tr. 1314.)  She told Ms. Hunt she had changed her mind about seeking employment due to her mental health issues and said she planned to apply for social security benefits.  (*Id.*)  Ms. Hunt agreed to help Ms. Thornsley with the application process.  (*Id.*)

Ms. Thornsley also followed up with APRN Dailey on October 19, 2021.  (Tr. 1245.)  She denied side effects from her medications, and reported good sleep, increased appetite, better anxiety, and improved depression symptoms.  (Tr. 1245.)  She denied suicidal thoughts.  (*Id.*)  Her symptom review was positive for mild anxiety and depression, but negative for insomnia,

panic attacks, poor attention, mood swings, and suicidal thoughts. (Tr. 1246.) Nothing had changed at a follow-up appointment on November 16, 2021, with the exception that Ms. Thornsley felt "more down" because she lost her cat. (Tr. 1242-43.) Her medications remained unchanged at both appointments. (Tr. 1246, 1243.) APRN Dailey did not record clinical mental status findings at either office visit. (Tr. 1242-47.)

On December 14, 2021, Ms. Thornsley reported to APRN Dailey that she had one panic attack in the past month. (Tr. 1240.) Otherwise, her anxiety was better, and her sleep and depression were good. (*Id.*) No mental status findings were recorded. (Tr. 1240-41.) APRN Dailey increased Ms. Thornsley's bupropion dose to 300mg a day and continued her other medications without change. (Tr. 1240.)

In January 2022, Ms. Thornsley reported to APRN Dailey that night anxiety disrupted her sleep but that her panic attacks had improved. (Tr. 1237.) APRN Dailey increased her dosage of propranolol to 40mg a day and kept her other medications the same. (*Id.*) The next month, Ms. Thornsley's sleep and panic attacks were improving, and her anxiety was better, but she felt down. (Tr. 1234.) No changes were made to her medications. (*Id.*) A follow-up appointment in March 2022 with APRN Dailey reflects no changes. (Tr. 1231.) No mental status findings were recorded at the January, February, or March appointments. (Tr. 1231-39.)

On January 11, 2022, Ms. Thornsley met with Ms. Hunt, and they discussed her social security application. (Tr. 1319.) Ms. Thornsley also informed Ms. Hunt that her current therapist was not a "good fit," and she wanted to switch therapists. (*Id.*) Ms. Hunt agreed to refer Ms. Thornsley to a new therapist. (*Id.*)

Throughout 2022, Ms. Thornsley continued to see Dr. Miller, primarily for physical health issues. (Tr. 993-1025.) Dr. Miller continued to note that Ms. Thornsley displayed normal

12

mood, behavior, thought content, and judgment, and that she was negative for dysphoric mood. (Tr. 996-97, 1014-15, 1020, 1023.)  This was true even at a May 4, 2022 appointment when she prescribed more Xanax because Ms. Thornsley's anxiety was "uncontrolled."  (Tr. 1017.)

Ms. Thornsley saw APRN Dailey again on May 3, 2022.  (Tr. 1228.)  She stated that her sleep was poor and broken and reported increased depression and anxiety, tiredness, and overeating.  (*Id.*)  She denied suicidal thoughts.  (*Id.*)  No mental status findings were recorded. (Tr. 1228-30.)  APRN Dailey increased Ms. Thornsley's clomipramine to 150mg a day and continued her other medications.  (Tr. 1228.)

On May 4, 2022, Ms. Thornsley had her first session with her new therapist at Cedar Ridge, Ashton Simon, LSW.  (Tr. 1320.)  Ms. Thornsley shared about her struggles with mental illness, discussing guilt she felt about living with her brother and not contributing financially, issues with body image and binge-eating, and a history of feelings of abandonment.  (*Id.*)

Ms. Thornsley saw LSW Simon again on July 12, 2022.  (Tr. 1322.)  She told him that her mental health had been "okay" since their last appointment and discussed spending more time in bed "feeling down."  (*Id.*)  She said her dog greatly supported her mental health and discussed friendships and other supports in her life.  (*Id.*)

At counseling appointment on August 9, 2022, Ms. Thornsley reported sleeping eight hours a night but staying up late.  (Tr. 1323.)  She said her anxiety was higher at night, which led her to take Xanax as prescribed by her primary care physician.  (*Id.*)  She also described recent panic attacks and symptoms of "dissociating" where she felt she had "tunnel vision."  (*Id.*)  She said she reached out to her supports during that time.  (*Id.*)  No significant changes were reported at a follow-up appointment on August 23, 2022.  (Tr. 1325.)

Ms. Thornsley attended a medication management appointment with APRN Dailey on August 16, 2022, at which she reported better sleep but increased anxiety and depression and a recent panic attack.  (Tr. 1226.)  She also reported intrusive thoughts such as "take your hand off the wheel" but denied a plan or intent to harm herself and denied current suicidal thoughts.  (*Id.*)  No mental status findings were recorded.  (Tr. 1226-27.)  APRN Dailey continued Ms. Thornsley's medications without change.  (Tr. 1226.)

A partial record from a counseling session on October 24, 2022, indicates that Ms. Thornsley presented as clean, cooperative, and attentive, with a normal mood, tearful affect, clear thought processes, normal judgment, and good insight and concentration.  (Tr. 1327.)[2]

The next counseling record available is from January 5, 2023.  (Tr. 1328.)  Ms. Thornsley told LSW Simon that she had not felt like coming to the appointment because it "gives her anxiety."  (*Id.*)  However, LSW Simon noted that Ms. Thornsley talked to him openly without prompting.  (*Id.*)  Ms. Thornsley reported OCD symptoms, including intrusive thoughts and re-checking things she had already done.  (*Id.*)  She and LSW Simon discussed setting small, attainable goals and worked on a plan for her to clean her room.  (*Id.*)

Ms. Thornsley's mental status findings from a February 16, 2023 appointment indicate that she presented as clean, cooperative, and attentive, with a normal affect, calm mood, clear speech and thought processes, normal judgment, and good insight and concentration.  (Tr. 1330.)

Ms. Thornsley saw APRN Dailey on February 27, 2023.  (Tr. 1274-76.)  She reported that increased propranolol had helped with her anxiety, and said her intrusive thoughts had improved.  (Tr. 1274.)  She also indicated that she had "mild OCD things," and her depression

---

[2] Several of the counseling records from Cedar Ridge appear to be missing pages, and the undersigned summarizes the available, relevant information.  These partial records contain the date in the top right-hand corner along with the notation "psychotherapy, 46-60 min."  (*See, e.g.*, Tr. 1327, 1330.)  This same notation appears on other records from appointments with LSW Simon, suggesting these partial records are from appointments with him.  (*See* Tr. 1328-29.)

was fair. (*Id.*) She denied suicidal ideation. (*Id.*) APRN Dailey continued prescriptions for propranolol, clomipramine, Effexor, and bupropion. (*Id.*)

On April 12, 2023, Ms. Thornsley started with a new counselor, Stephanie Taylor, LPC. (Tr. 1331-32.) She told LPC Taylor that she did not work due to anxiety. (Tr. 1331.) She said she was previously suicidal and had OCD and borderline personality disorder but said that her medication was helping. (*Id.*) LPC Taylor noted that Ms. Thornsley was talkative, used a lot of psychiatric/mental health terminology, wanted to be the sole focus, and was impatient. (*Id.*)

At a May 8, 2023 visit with LPC Taylor, Ms. Thornsley discussed her pending social security claim, saying she had no other issues bothering her, and she was "getting by." (Tr. 1333.) On June 6, 2023, in a telehealth session, Ms. Thornsley reported that her psychiatric provider was lowering her medication dosage, as she was on "too much medication but not getting better." (Tr. 1334.) She said she had side effects from all her medications. (*Id.*) She also reported that she lacked purpose and meaning, that she wanted to "have a normal brain," and that she had tried many different psychiatrists, but nothing had helped her. (*Id.*)

### 2. Opinion Evidence

#### i. Treating Source

On January 31, 2023, APRN Dailey completed a checkbox-style, medical opinion form regarding Ms. Thornsley's mental ability to work. (Tr. 1272-73.) Regarding unskilled work, APRN Dailey opined that Ms. Thornsley was seriously limited in her ability to: maintain regular attendance and be punctual within customary, usually strict tolerances; complete a normal workday and workweek without interruption from psychologically based symptoms; and deal with normal work stress. (Tr. 1272.) For all other areas of functioning, she handwrote the notation "N/A," apparently declining to offer an opinion. (*Id.*)

15

Regarding semiskilled, skilled, or particular work, APRN Dailey opined that Ms. Thornsley was limited but satisfactory in her ability to understand and remember detailed instructions.  (Tr. 1273.)  She opined that Ms. Thornsley was seriously limited in her ability to: carry out detailed instructions; set realistic goals or make plans independently of others; deal with work stress; interact appropriately with the general public, maintain socially appropriate behavior; adhere to basic standard of neatness and cleanliness; travel in unfamiliar places; and use public transportation.  (*Id.*)

Finally, APRN Dailey opined that Ms. Thornsley's impairments and treatment would cause her to miss about four days of work per month.  (*Id.*)

### ii.   Consultative Examiner

Ms. Thornsley presented to Stephen Billman, Psy.D., D, ABSM, for a consultative examination on May 26, 2022.  (Tr. 985-91.)  In addition to interviewing Ms. Thornsley, Dr. Billman reviewed a September 2021 psychological evaluation from APRN Dailey, a February 2021 psychological evaluation from Dr. Moses, and an adult disability report.  (Tr. 986.)

Ms. Thornsley described her typical mood as "Okay, surviving" and said she was not happy, though she had a better mood when it was sunny.  (Tr. 987.)  She reported sleeping a lot, disturbed appetite, and crying daily but less-so recently.  (*Id.*)  She also reported low energy, being easily fatigued, low self-esteem, and a "horrible" memory.  (*Id.*)  She feared dying in her sleep.  (*Id.*)  She denied current suicidal or homicidal ideation, mania, or hypomania. (*Id.*)  She endorsed fear of abandonment, feeling empty inside, experiencing multiple moods in one day, an unstable self-image, cutting her thighs in high school, intrusive thoughts, avoiding crowds, and being irritable.  (*Id.*)  She reported a heightened startle response and hypervigilance.  (*Id.*)

16

Regarding her work history and activities of daily living, Ms. Thornsley said she had worked at over ten jobs and that her longest job was part-time fast-food service for seven years. (Tr. 988.)  She had last worked two or three years prior and left that job due to frequent panic attacks.  (*Id.*)  She said she spent her days cleaning the house and preferred not to leave home. (*Id.*)  She could drive, manage her money, and help with other chores at home.  (*Id.*)  She had five close friends and maintained contact with her brother, who she lived with.  (*Id.*)

During the evaluation, Ms. Thornsley was cooperative and established a rapport with Dr. Billman.  (*Id.*)  Her speech was clear, understandable, and adequately organized.  (*Id.*)  She displayed logical, coherent, and goal directed thoughts, and her phraseology, grammatical structure, and vocabulary suggested she was of average to above average intelligence.  (*Id.*)  She did not endorse suicidal or homicidal thoughts but presented as depressed with a blunted affect and "somewhat stiff manner consistent with anxiety."  (*Id.*)  She did not display any indications of hallucinations, delusions, paranoid ideation, obsessions, or compulsions.  (*Id.*)  She was alert, responsive, and oriented.  (*Id.*)  She correctly stated her age, social security number, and birth date.  (*Id.*)  She recalled six digits forward and five digits backward and recalled two of three simple words after four minutes of interference, recalling the third word with multiple-choice. (*Id.*)  She "quickly and correctly" performed basic math equations, knew basic facts such as the current president, was able to identify similarities in named pairs of objects, and could interpret simple aphorisms.  (*Id.*)  Her overall intellectual abilities appeared to be average.  (*Id.*)  As to her insight and judgment, she appeared able to make decisions about her future and living arrangements, she demonstrated some insight into her current difficulties, and she seemed capable of accessing community support as needed.  (*Id.*)

Dr. Billman diagnosed Ms. Thornsley with post-traumatic stress disorder with associated panic attacks, borderline personality disorder, and persistent depressive disorder.  (Tr. 989.)  He further provided a functional assessment of her mental abilities in the four categories of mental functioning, as follows.  (Tr. 990.)  As to understanding, remembering, and carrying out instructions, he opined that Ms. Thornsley would have no expected limitations, as she presented with average intellectual abilities and adequate memory.  (*Id.*)  As to maintaining attention, concentration, persistence, and pace, Dr. Billman opined that Ms. Thornsley's diagnoses were "likely to significantly affect her ability to maintain attention, concentration, persistence, and pace to perform even simple tasks for long periods of time in the workplace until further treated."  (*Id.*)  As to responding appropriately to supervision and coworkers in a work setting, Dr. Billman opined that Ms. Thornsley would have no expected limitations as she "interacted adequately" with him and "did not report having difficulty interacting with supervisors or coworkers or experiencing significant anger issues" despite having had more than ten jobs.  (*Id.*)  As to responding appropriately to work pressures, Dr. Billman opined that Ms. Thornsley was "likely to experience significant limitations in this area until much further treated" due to her undertreated mental health symptoms.  (*Id.*)

### iii.        State Agency Medical Consultants

On June 10, 2022, state agency psychological consultant Lisa Foulk, Psy.D., completed a psychiatric review technique ("PRT") and mental residual functional capacity ("RFC") assessment of Ms. Thornsley.  (Tr. 74-75, 77-78, 85-86, 88-89.)  Dr. Foulk opined that Ms. Thornsley had no limitations in understanding, remembering, or applying information, no limitations in interacting with others, moderate limitations in concentrating, persisting, or maintaining pace, and moderate limitations in adapting or managing oneself.  (Tr. 75, 86.)  She

further opined that Ms. Thornsley had the mental RFC to: complete moderately complex tasks in a routine work environment without high production or pace quotas and to adapt to changes explained in advance.  (Tr. 77-78, 88-89.)

On September 22, 2022, state agency psychological consultant Irma Johnston, Psy.D., affirmed Dr. Foulk's determinations but added the RFC restriction that Ms. Thornsley could adapt to infrequent changes.  (Tr. 100, 109.)

### C.    Function Report

Ms. Thornsley completed an Adult Function Report on March 4, 2022.  (Tr. 266-73.) She reported living with family and being unable to work due to her debilitating panic disorder, borderline personality disorder, anxiety, depression, and agoraphobia.  (Tr. 266.)  She experienced "violent" panic attacks any time she tried to work or leave her home.  (*Id.*)  The panic attacks affected her speech, breathing, vision, and ability to think clearly.  (*Id.*)  Her depression made it impossible for her to leave her bed most days.  (Tr. 266, 273.)  From the time she woke up until the time she closed her eyes, she felt "at war" with her brain, and she feared everything, no matter how irrational.  (Tr. 273.)  She also endorsed OCD, which caused "disturbing" intrusive thoughts she could combat for an entire day.  (*Id.*)

With respect to the activities of daily living, Ms. Thornsley reported that she took her medicine when she woke up, took her dog outside, then ate something.  (Tr. 267.)  Some days she laid back down due to her depression.  (*Id.*)  Other days, she sat on the couch with her dog. (*Id.*)  She reported spending most of the day "more or less coping and grounding [her]self."  (*Id.*) On good days, she tidied the house, and at night she took her medicine and tried sleep.  (Tr. 267, 273.)  Her insomnia did not allow her to get much or quality sleep.  (Tr. 273.)

19

Ms. Thornsley could care for her dog, and her brother helped "on extra bad days." (Tr. 267.) She would go days or a whole week without changing clothes or bathing, her hair was always greasy and tangling, she did not shave, and she ate what was brought to her or already in the house. (*Id.*) She has always had mental illness, but she used to be able to leave her house and be social. (*Id.*) Her conditions affected her sleep in that she had insomnia and slept during the day. (*Id.*) She reported needing reminders and encouragement to shower and change her clothes and to take her medication. (Tr. 268.) She usually ate what was easiest, such as microwave meals. (*Id.*) Once a month, she prepared a "well-cooked" dinner. (*Id.*) Before the onset of her condition, she loved to cook big meals, but she no longer had the energy. (*Id.*) She was able to do dishes or laundry when asked multiple times, but she did not do them often because it felt impossible and took weeks. (*Id.*)

Ms. Thornsley reported she rarely went outside, and then only for appointments that she usually canceled due to panic attacks. (Tr. 269.) When she left the house, she drove or rode in a car, and she was able to go alone. (*Id.*) She shopped for food by mail and not often. (*Id.*)

Ms. Thornsley was not able to pay bills, but could count change, handle a savings account, and use a checkbook or money order. (*Id.*) Her hobbies included watching television and reading, but she did not do these things often or as well as she used to. (Tr. 270.) Since her condition began, she had lost energy and interest in these activities. (*Id.*) She reported spending time with others in person, on the phone, and by texting. (*Id.*) Four to five times a week, she spent time with her brother when he came home from work. (*Id.*) She did not go anywhere regularly. (*Id.*) She had trouble getting along with others when she was in a bad mood and was not social at all. (*Id.*) Her friends had stopped inviting her to things. (*Id.*)

Ms. Thornsley said her conditions limited her in lifting, squatting, bending, standing, walking, kneeling, talking, stair climbing, memory, completing tasks, concentration, and getting along with others.  (Tr. 271.)  She explained that her memory was terrible, her physical health had been greatly affected by her conditions, and she could not stand or walk more than ten minutes.  (*Id.*)  She was right-handed.  (*Id.*)  She could walk fifty yards before needing a five-to-ten-minute break.  (*Id.*)  She could pay attention for ten minutes, she did not finish what she started, and she was "okay" at following written and spoken instructions.  (*Id.*)  She felt like authority figures did not understand her.  (*Id.*)

Ms. Thornsley reported that she did not handle stress or changes in routine well.  (Tr. 272.)  She feared "almost everything" and was "in almost a constant state of panic and fear." (*Id.*)  She did not use assistive devices, like a cane or wheelchair.  (*Id.*)  She reported memory loss and tremors from her medications but could not recall which ones.  (Tr. 273.)

## D.   Hearing Testimony

### 1.   Ms. Thornsley's Testimony

At the hearing on June 27, 2023, Ms. Thornsley testified in response to questions by the ALJ and her attorney.  (Tr. 35-65.)  She testified that she lived with her brother and dog.  (Tr. 45.)  She said the dog laid in bed with her, but she did not help care for it.  (Tr. 45-46.)  Ms. Thornsley's brother worked during the day, so she was usually home alone.  (Tr. 46.)

Ms. Thornsley testified that she struggled to maintain day-to-day activities such as grooming, dressing, and feeding herself.  (*Id.*)  Some days she could not get out of bed to brush her teeth or shower, and she did not take care of herself for "significant periods of time."  (*Id.*) Even on good days, she did not leave the house for long periods of time.  (*Id.*)  Ms. Thornsley

testified that she was not able to drive; when she had to go somewhere, her father or brother took her.  (Tr. 46-47.)  She did not leave the house except to attend doctor's appointments.  (Tr. 47.)

Ms. Thornsley graduated high school and was not currently working.  (*Id.*)  She started college but went home due to her mental health issues and was hospitalized soon after.  (*Id.*)  This was the first of two hospitalizations related to her mental health; the second took place about a year later.  (Tr. 47-48.)

Regarding her past work experience, Ms. Thornsley did not know the exact number of jobs she had tried in different settings.  (Tr. 48.)  She said she usually ended up having severe panic attacks and staying in the bathroom crying, unable to do anything.  (*Id.*)  She felt unable to find another job.  (Tr. 49.)  Her longest job was part-time at a McDonald's during high school.  (*Id.*)  She left that job because her mental health caused her to miss more days than she worked.  (*Id.*)  She was not fired, but only because the manager gave her the opportunity to quit because she was missing work, going home, or taking extra breaks to hide in the back room and cry.  (*Id.*)

When the ALJ asked her to explain what prevented her from working, Ms. Thornsley said her life was "terrible," and she had "borderline personality disorder" which caused her to "fluctuate quite a bit in a short period of time."  (*Id.*)  She explained she would be depressed for weeks at a time to the extent that she could not leave her bed or her house.  (*Id.*)  She also had OCD, constant intrusive thoughts, and a lot of suicidal ideations.  (*Id.*)  Mental health disorders run in her family; her mother and grandmother both had severe agoraphobia and could not leave the house.  (Tr. 50.)  Both had been hospitalized multiple times.  (*Id.*)

Regarding her mental health treatment, Ms. Thornsley testified she had been seeing a psychiatric nurse practitioner and a counselor at Cedar Ridge monthly since August 2021.  (Tr. 50-51.)  She was taking propranolol, Wellbutrin, and "enasprinil" (phonetic) for her mental

health.  (Tr. 51.)  She did not feel like the medication was helping as she saw no improvement, and her healthcare providers had to keep changing her medication.  (Tr. 51-52.)  Since increasing her dosage of propranolol and Effexor, she had not noticed any benefits to her anxiety symptoms.  (Tr. 52.)  Ms. Thornsley took a Xanax at least once a night due to night anxiety. (*Id.*)  Her anxiety flared up during her menstrual cycle, so she took more.  (*Id.*)  She also took Xanax during the day "quite frequently."  (*Id.*)  She was prescribed up to two pills a day and usually took both.  (*Id.*)

During a panic attack, Ms. Thornsley testified that her body became hot and cold at the same time, she felt physically sick to her stomach, and she experienced "this impending doom, something really bad's happening that you don't know what."  (*Id.*)  The attacks also made her feel "out of touch with reality," and she would become convinced she was dying.  (Tr. 53.)  Her panic attacks were frequent, debilitating, and could last up to an hour.  (*Id.*)  To help herself get through a panic attack, Ms. Thornsley would call a family member if possible, try breathing through it, or take a hot shower.  (*Id.*)  She would also "just . . . ride it out."  (*Id.*)

Ms. Thornsley said that she spent a significant amount of time in bed, and that it felt impossible to get up and do something, like dishes, on most days.  (*Id.*)  She would swing between sleeping too much and not sleeping enough.  (Tr. 53-54.)  She did not do grocery shopping or anything similar.  (Tr. 54.)  Her depression caused her not to shower or brush her hair, and her teeth were terrible, but she could not have them fixed because she was unable to go to the dentist.  (*Id.*)  She did not dress herself when she was deep in depression and felt like that deep level of depression never ended.  (*Id.*)  She could get out of bed on some days, but 90% of the time she was "just done."  (Tr. 55.)  She said she had no social skills and no friends.  (*Id.*)

Her father would visit her sometimes, but she never saw her mother, who did not leave her own house.  (*Id.*)  She would talk to her mother on the phone, but not often.  (*Id.*)

Ms. Thornsley testified she did not have the attention span for movies.  (*Id.*)  She used to love reading, but she could no longer focus long enough to read.  (*Id.*)  Her attorney noted that a medical record from about a year before the hearing says Ms. Thornsley read books and asked when she stopped being able to read.  (*Id.*)  Ms. Thornsley said in college things started going "downhill" for her.  (Tr. 56.)  She had always been medicated and struggled with her mental health, but when she came home from college, she "needed more."  (*Id.*)

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified.  (Tr. 57-63.)  The VE testified that a hypothetical individual of Ms. Thornsley's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination could perform the following or similar jobs in the national economy: marker, routing clerk, or garment sorter.  (Tr. 59.)  He testified that there would be no work for a person who could have no contact with coworkers (Tr. 59-60) and that no light, unskilled jobs were available if the person needed to work from home (Tr. 60).  He also testified that it would eliminate competitive work if the hypothetical individual would need occasional redirection or extra supervision to stay on task, would be off task 10% or more of the workday, or would be absent more than one day per month.  (Tr. 60-61.)

### III.  Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

24

impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520[3]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters*

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.    The ALJ's Decision

In his August 15, 2023 decision, the ALJ made the following findings:[4]

1.     The claimant meets the insured status requirements of the Social Security
       Act through March 31, 2023.  (Tr. 14.)

2.     The claimant has not engaged in substantial gainful activity since January
       1, 2019, the alleged onset date.  (*Id.*)

3.     The claimant has the following severe impairments: morbid obesity;
       lumber degenerative disc disease, with mild retrolisthesis at L5-S1 and
       intermittent sciatica; and affective dysfunction variously diagnosed to
       include depressive, dysthymic, premenstrual dysphoric, bipolar, anxiety,
       panic, obsessive-compulsive, borderline personality, and post-traumatic
       stress disorders, with a histroy of benzodiazepine dependence.  (Tr. 14-15.)

4.     The claimant does not have an impairment or combination of impairments
       that meets or medically equals the severity of the listed impairments in 20
       C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15.)

5.     The claimant has the residual functional capacity to perform light work as
       defined in 20 C.F.R. § 404.1567(b) and 416.967(b), within the following
       parameters: She can never climb ladders, ropes, or scaffolds, she must
       avoid all exposure to unprotected heights, and she can no more than
       occasionally climb ramps/stairs, stoop, crouch, and crawl. The claimant
       can perform a wide variety of simple and complex tasks, but she cannot
       perform any tasks requiring high production rate pace (for example,
       assembly line work). She is limited to a non-public routine work setting
       where changes are no more than occasional, and she is limited to
       occasional and "superficial" interaction with supervisors and coworkers,
       with "superficial" defined to mean not involving sales, arbitration,
       negotiation, conflict resolution, confrontation, group/tandem/collaborative
       tasks, or the management/direction/persuasion of others.  (Tr. 24-25.)

6.     The claimant has no past relevant work.  (Tr. 26.)

---

[4] The ALJ's findings are summarized.

7.  The claimant was born on January 6, 1995 and was 23 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.*)

8.  The claimant has at least a high school education.  (*Id.*)

9.  Transferability of job skills is not an issue as claimant has no past relevant work.  (*Id.*)

10.  Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform, including marker, garment sorter, and routing clerk.  (*Id.*)

Based on the foregoing, the ALJ determined that Ms. Thornsley had not been under a disability, as defined in the Social Security Act, from January 1, 2019, through the date of the decision on August 15, 2023.  (Tr. 29.)

## V.  Plaintiff's Arguments

In her sole assignment of error, Ms. Thornsley argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly evaluate the medical opinion of her treating mental health provider, APRN Dailey.  (ECF Doc. 7, pp. 1, 7.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

27

F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

28

**B.**     **Sole Assignment of Error: Whether the ALJ Properly Evaluated the Medical Opinion of APRN Dailey.**

In her sole assignment of error, Ms. Thornsley argues that the RFC lacked the support of substantial evidence because the ALJ failed to properly evaluate the medical opinion of her treating mental health provider, APRN Dailey.  (ECF Doc. 7, pp. 7-12; ECF Doc. 15.)  The Commissioner responds that the ALJ's evaluation of APRN Dailey's opinion complied with the regulations and was supported by substantial evidence.  (ECF Doc. 9, pp. 7-12.)

**1.**     **Framework for Evaluation of Medical Opinion Evidence**

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. §§ 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence. *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

### 2. The ALJ Adequately Evaluated APRN Dailey's Medical Opinion

The ALJ analyzed the persuasiveness of APRN Dailey's medical opinion as follows:

On January 31, 2023, APRN Dailey advised that the claimant has no limitations in:

Remembering work-like procedures, understanding/remembering/carrying out very short and simple instructions, making simple work-related decision, maintaining attention for 2 hours at a time, performing tasks at a consistent pace, sustaining an ordinary routine without supervision, working around others without being unduly distracted, appropriately accepting instructions/correction/criticism, getting along with others in the workplace, and responding appropriately to changes in workplace routine (Exhibit 10F).

The claimant's psychiatric prescriber further advised, however, that the claimant would be absent from "about four days per month," and is markedly limited in her abilities to: Maintain regular attendance, complete a normal day/week, deal with normal work stress, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and interact appropriately with the general public (Exhibit 10F).

> As with the conclusions of Dr. Billmann, I find neither the lack of any limitation nor the marked level of dysfunction opined by APRN Dailey fully supported or persuasive – particularly when she noted the claimant to report in February 2023 that an adjustment of her medications "helped with anxiety," that her "intrusive thoughts have improved," and that her depression was "fair" (Exhibit 11F/1).

(Tr. 23 (emphasis added).)

Ms. Thornsley asserts that the ALJ's evaluation of the persuasiveness of APRN Dailey's medical opinion was inadequate and did not comply with regulatory requirements because the ALJ "failed to provide a sufficient basis" for rejecting the opinion's findings.  (ECF Doc. 7, p. 7.)  Ms. Thornsley's more specific arguments challenging the ALJ's analysis of the factors of "consistency" and "supportability" are addressed in turn below.

### i.    The ALJ Adequately Evaluated Consistency

As to consistency—the extent to which APRN Dailey's findings are consistent with evidence from other medical and nonmedical sources—Ms. Thornsley argues that the ALJ "completely failed to consider the consistency factor" because he "did not compare [APRN] Dailey's opinions to any other evidence of record."  (ECF Doc. 7, p. 9.)  The Commissioner responds that the ALJ adequately addressed this factor, first through reference to his earlier analysis of the persuasiveness of Dr. Billman's medical opinion, and second through a subsequent discussion of each area of mental functioning.  (ECF Doc. 9, pp. 8-11.)

As an initial matter, it is well established that an ALJ may rely on information articulated elsewhere in his decision to support a persuasiveness finding and need not rearticulate such information in his analysis.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding

no need to require the ALJ to "spell out every fact a second time").  Further, an ALJ need not

"discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole

and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x

195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th

Cir. 2006) (per curiam)).  And an ALJ "is not required to use specific phrasing referencing the

regulations" since decisions should be read "as a whole and with common sense." *McCarty v.*

*Comm'r of Soc. Sec.*, No. 4:24-cv-00451-DAC, 2024 WL 4695900 at *8 (N.D. Ohio Nov. 6,

2024) (citing *Sovey v. Kijakazi*, No. 5:20-CV-00386-MAS, 2022 WL 447052, at *4 (E.D. Ky.

Feb. 9, 2022) (collecting cases rejecting "magic words" arguments)).

Consistent with the Commissioner's first argument, the undersigned finds that the ALJ's

reference to "the conclusions of Dr. Billmann" in his brief analysis of APRN Dailey's opinion

may clearly be read as a direct reference to, and adoption of, the ALJ's earlier analysis of the

persuasiveness of consultative examiner Dr. Billman's medical opinion, where he explained:

> I find neither Dr. Billmann's objective- or subjective-based opinion fully
> persuasive because <u>other clinical findings and the record as a whole establish both
> that the claimant has some limitations her interactive, attentive, and adaptive
> functioning, but that those limitations – as concluded by both providers Drs. Miller
> and Moses, and the State agency psychological consultants – do not result in
> marked, extreme, or work-preclusive limitations in the claimant's ability to sustain
> simple tasks (such as housecleaning all day), or to tolerate (within the parameters
> set forth below) ordinary day-to-day work.</u>

(Tr. 22 (emphasis added).)  In referring to that earlier analysis, the ALJ effectively incorporated

into his analysis of APRN Dailey's medical opinion his earlier findings that, while "other clinical

findings and the record as a whole" established that Ms. Thornsley had some limitations in

mental functioning, those limitations were not "marked, extreme, or work-preclusive" according

to the records and the conclusions of other medical sources.  (*Id.*)  Further, before articulating

those broad analytical conclusions regarding "other clinical findings and the record as a whole,"

32

the ALJ provided a lengthy, thorough discussion and analysis of the underlying medical records. (Tr. 15-22.)  With specific pinpoint citations to relevant records, the ALJ acknowledged Ms. Thornsley's reports of anxiety and other symptoms that interfered with her ability to work and summarized her mental health treatment history.  (*Id.*)  But the same discussion also noted specific instances of treatment noncompliance and failure to follow up with providers, reports of minimal or reduced symptoms, reported daily activities like housework or going on vacation, unremarkable clinical findings, an assessment by primary care provider Dr. Miller stating that her anxiety was controlled but she was "scared to get a job," and a statement by mental health provider Dr. Moses that he would not sign a letter saying she could not work because she had not been compliant with meeting her counselor and keeping appointments.  (*Id.*)  Thus, considering the ALJ decision as a whole, the ALJ's reference to his earlier analysis of Dr. Billman's opinion specifically incorporated an analysis of the consistency of APRN Dailey's opinions with the objective medical evidence, treatment records, subjective reports, and other medical opinions.

Moreover, consistent with the Commissioner's second argument, the undersigned finds that the ALJ's subsequent evaluation of mental functioning included numerous specific instances where the ALJ analyzed the consistency of APRN Dailey's opinion findings with other evidence of record.  For example, in discussing the category of "understanding, remembering, and applying information," the ALJ found APRN Dailey's opinion consistent with other medical opinions finding Ms. Thornsley had no limitations in this area.  (Tr. 23.)  In discussing the category of "interacting with others," the ALJ acknowledged that APRN Dailey found marked limitations in the ability to maintain socially appropriate behavior, but that the State agency psychological consultants found no limitations in this area.  (Tr. 24.)  The ALJ went on to reference his prior discussion of the medical records by acknowledging evidence suggesting a

33

poor self-image and mental impairments that interfered with Ms. Thornsley's ability to engage with others and handle interpersonal conflict, but ultimately found that her "abilities to ask for help when needed and to understand/respond appropriately to non-verbal cues and correction/criticism are not particularly or significantly limited." (*Id.*)  In discussing the category of "concentration, persistence, and pace," the ALJ acknowledged APRN Dailey's finding that Ms. Thornsley lacked the wherewithal to attend and complete tasks reliably, but concluded that "a finding of marked, extreme, or work-preclusive limitations in this area" was not supported by the opinions of the State agency consultants, the assessments of Drs. Miller and Moses, Ms. Thornsley's "routinely intact clinical attention and concentration," and her "acknowledged ability to regularly complete household tasks." (*Id.*)  And in discussing "adaptation and symptom management," the ALJ observed that the opinions of both Dr. Billmann and APRN Dailey (which suggested disabling limitations in this area) were "based on the claimant's stated inability to work," while the opinions of the State agency psychological consultants, the clinical evidence, and Ms. Thornsley's activities and ability to maintain herself in the community all supported no more than moderate limitations. (*Id.*)  Taken together, the ALJ's specific analysis of the four areas of mental functioning provide a further, detailed assessment outlining the ALJ's findings regarding the consistency of APRN Dailey's opinions with other evidence of record.

Ultimately, a review of the ALJ's complete written decision reveals that he gave detailed consideration to the underlying medical records and adequately articulated his reasons for concluding that APRN Dailey's more restrictive opinion findings were not fully supported or persuasive.  The fact that the ALJ did not specifically use the word "consistency" in his opinion analysis, that he incorporated earlier analytical findings by reference, and that he provided further and more specific analysis of the consistency of the opinion findings after he made his

34

persuasiveness finding does not alter the fact that the written decision as a whole adequately articulated the ALJ's analyses of the "consistency" of APRN Dailey's medical opinion findings. *See Guthrie v. Comm'r of Soc. Sec.*, No. 3:22 CV 1309, 2024 WL 1466867, at *2 (N.D. Ohio Apr. 4, 2024) (finding an ALJ is not required to use the words "supportability" or "consistency" in making findings regarding those factors) (collecting cases); *Guthrie v. Comm'r of Soc. Sec.*, No. 3:22 CV 1309, 2023 WL 6258259, at *2 (N.D. Ohio Sept. 26, 2023) (finding factors need not be discussed "in a specific area of [a] decision" to be properly addressed) (citing *Crum*, 660 F. App'x at 455).

Ultimately, the undersigned finds the ALJ's explanation as to "consistency" is sufficient to permit meaningful judicial review of the basis for the ALJ's findings.

### ii. The ALJ Adequately Evaluated Supportability

As to supportability—the extent to which APRN Dailey's objective findings and supporting explanations substantiated or supported her opinion findings—Ms. Thornsley argues that the ALJ improperly "relied on a single page from [APRN] Dailey's time treating Ms. Thornsley to discredit her entire set of opinions," when that one page "[a]t best . . . represented a snapshot of [APRN] Dailey's treatment of Ms. Thornsley." (ECF Doc. 7, pp. 9, 10.) This argument is based on the following limited findings regarding APRN Dailey's opinion:

> I find neither the lack of any limitation nor the marked level of dysfunction opined by APRN Dailey <u>fully supported</u> or persuasive – <u>particularly when she noted the claimant to report in February 2023 that an adjustment of her medications "helped with anxiety," that her "intrusive thoughts have improved," and that her depression was "fair."</u>

(Tr. 23 (emphasis added).) The Commissioner responds that Ms. Thornsley's argument that the ALJ considered only one treatment record is not entirely accurate, since the ALJ explicitly considered other treatment notes from APRN Dailey in his earlier discussion of the medical records. (ECF Doc. 9, pp. 11-12.)

As discussed above, an ALJ need not rearticulate information set forth earlier in his decision, *see Crum*, 660 F. App'x at 457, and need not "discuss each piece of data in [his] opinion," *Boseley*, 397 F. App'x at 199.  Here, the ALJ discussed the following treatment records from APRN Dailey prior to analyzing APRN Dailey's medical opinion:

- The initial medication management assessment of 9/27/21, where APRN Dailey diagnosed borderline personality disorder, continued prescriptions for Wellbutrin and clomipramine, and added propranolol (Tr. 21 (citing Tr. 969, 973));

- The follow up appointment of 10/19/21, where Ms. Thornsley denied medication side effects and reported that her anxiety was "better", and her depression and sleep were "good" (*id.* (citing Tr. 1245));

- The appointment of 1/11/22, where Ms. Thornsley reported "[n]ight anxiety" and APRN Dailey increased her propranolol dosage (*id.* (citing Tr. 1237));

- The appointment of 2/8/22, where Ms. Thornsley reported that her sleep was "fair" (after having been "off" on 1/11/22, prior to the propranolol increase) and that her panic attacks "continue[d] to improve" (*id.* (citing Tr. 1234)); and

- The appointment of 3/8/22, where Ms. Thornsley reported that her depression was "manageable" but complained of debilitating back pain (*id.* (citing Tr. 1231)).

It was in the context of this prior discussion that the ALJ found the marked level of dysfunction described in APRN Dailey's January 2023 medical opinion was not fully supported, "particularly" given APRN Dailey's own observations in her February 2023 treatment notes that Ms. Thornsley reported: a recent medication increase "helped with her anxiety"; her intrusive thoughts had "improved"; and her depression was "fair."  (Tr. 23 (citing Tr. 1274).)  The ALJ's earlier discussion of APRN Dailey's other treatment records informs a finding that his supportability analysis was not limited to the February 2023 record alone, but merely emphasized that record "particularly" due to its proximity in time to APRN Dailey's opinion. *See Guthrie*, 2023 WL 6258259, at *2 ("The ALJ need not discuss supportability in a specific area of her decision in order to properly address the issue.") (citing *Crum*, 660 F. App'x at 455).

Ms. Thornsley argues that the ALJ did not adequately represent her treatment history with APRN Dailey because he did not acknowledge treatment records showing fluctuations in her symptoms.  (ECF Doc. 7, pp. 10-11.)  In particular, Ms. Thornsley highlights a May 3, 2022 treatment visit where she complained of "poor and broken" sleep and "increased depression and anxiety," and an August 16, 2022 treatment visit where she complained of "increased depression and anxiety," feeling tired, overeating, "a panic attack for the first time in a while," and "intrusive thoughts" with no plan or intent to harm herself.  (*Id.* (citing Tr. 1209, 1211).)  The Commissioner responds that the ALJ "was not required to cite every piece of evidence from [APRN] Dailey's treatment records" to justify his concerns.  (ECF Doc. 9, pp. 11-12.)

While an ALJ need not "discuss each piece of data in [his] opinion," he must "consider the evidence as a whole and reach a reasoned conclusion."  *Boseley*, 397 F. App'x at 199.  Here, it is undisputed that the ALJ did not specifically discuss Ms. Thornsley's subjective symptom reports to APRN Daily in May and August 2022.  He did, however, acknowledge various other reports of fluctuating symptoms that Ms. Thornsley made to other providers over a period of years, including complaints of anxiety, depression, and poor sleep.  (*See* Tr. 15-23.)  He also acknowledged Ms. Thornsley's reports to Dr. Miller of "a lot of nighttime anxiety" in May 2022, which led Dr. Miller to assess her anxiety as uncontrolled and increase her Xanax prescription. (Tr. 21 (citing, e.g., Tr. 1013, 1017).)  And the ALJ acknowledged in discussing Ms. Thornsley's February 2023 treatment visit with APRN Dailey that a recent medication adjustment was responsible for Mr. Thornsley's reported improvements in anxiety and intrusive thoughts and "fair" depression.  (Tr. 23 (citing Tr. 1274).)  In this context, the undersigned does not find the ALJ's failure to highlight Ms. Thornsley's subjective symptom reports to APRN Dailey in May and August 2022 deprived his "supportability" analysis of the support of substantial evidence.

Ultimately, the undersigned concludes that the ALJ's explanation as to "supportability" is sufficient to permit meaningful judicial review of the basis for the ALJ's findings.

In reviewing the analysis of APRN Dailey's medical opinion, this Court must evaluate whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion was not fully supported or persuasive; and made findings that were supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c; 20 C.F.R. § 404.1520(e); *Blakley*, 581 F.3d at 405.  In doing so, this Court must acknowledge that the "'substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  Thus, even if substantial evidence supports Ms. Thornsley's position, this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

Having reviewed the ALJ decision as a whole, the undersigned concludes that the ALJ articulated the basis for his persuasiveness findings in a manner that adequately explained how he considered the factors of "consistency" and "supportability," and that Ms. Thornsley has not demonstrated that the ALJ's explanations or findings lacked the support of substantial evidence.

The undersigned accordingly finds that Plaintiff's assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.


June 18, 2025


/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge



## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within
fourteen (14) days after being served with a copy of this document.  Failure to file objections
within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire
v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).